**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

SHEHAN WIJESINHA
individually and on behalf of all others
similarly situated,

      Plaintiff,

v.

SUSAN B. ANTHONY LIST, INC.,

      Defendant.

CASE NO. 1:18-cv-22880-JEM

**<u>DEFENDANT SUSAN B. ANTHONY LIST, INC.'S MOTION TO DISMISS, OR, IN THE
ALTERNATIVE, MOTION TO STAY, AND INCORPORATED MEMORANDUM OF
LAW</u>**
**(Claim of Unconstitutionality)**

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

I.       BACKGROUND.............................................................................................................1

II.      HOLDING SBA LIST LIABLE HERE WOULD VIOLATE THE FIRST AMENDMENT ....................2

     A.       The TCPA's Content-Based Provisions Cannot Survive Strict Scrutiny ...............3

          1.       These exemptions render the TCPA content-based ....................................4

          2.       These exemptions cannot survive strict scrutiny .......................................6

          3.       The proper remedy is to invalidate Section 227(b)(1)(A)(iii) ....................9

     B.       The TCPA's ATDS Provision Is Unconstitutionally Overbroad If
          Applied To Cover Equipment That Merely Stores and Dials Numbers ...............11

     C.       At the Least, the TCPA's ATDS Provision Cannot Be Applied to
          Targeted, One-Off, Costless, Time-Sensitive Political Text Messages.................13

III.     ALTERNATIVELY, THIS COURT SHOULD STAY PROCEEDINGS UNTIL THE FCC
     HAS INTERPRETED THE ATDS PROVISION .........................................................................15

IV.      CONCLUSION..............................................................................................................18

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACA Int'l v. FCC*,
    885 F.3d 687 (D.C. Cir. 2018)................................................................13, 16

*Ammons v. Ally Fin., Inc.*,
    326 F. Supp. 3d 578, 2018 WL 3134619 (M.D. Tenn. 2018)................17

*Arizona Free Enter. Club's Freedom Club PAC* v. *Bennett*,
    564 U.S. 721 (2011)................................................................................8

*Arkansas Writers' Project, Inc.* v. *Ragland*,
    481 U.S. 221 (1987)........................................................................4, 8, 10

*Boyes v. Shell Oil Prods. Co.*,
    199 F.3d 1260 (11th Cir. 2000) ..........................................................15

*Carey* v. *Brown*,
    447 U.S. 455 (1980)..................................................................... *passim*

*Cargo Airline Ass'n Petition*,
    29 FCC Rcd. 5056 (2014).................................................................3, 5, 6

*City of Ladue* v. *Gilleo*,
    512 U.S. 43 (1994)...............................................................................4, 5

*Dominguez v. Yahoo, Inc.*,
    894 F.3d 116 (3d Cir. 2018)..............................................................11, 17

*FCC* v. *Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)............................................................................10

*First Nat'l Bank of Boston v. Bellotti*,
    435 U.S. 765 (1978)......................................................................7, 9, 13

*Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*,
    377 F.3d 1164 (11th Cir. 2004) ..........................................................16

*Free Enter. Fund* v. *PCAOB*,
    561 U.S. 477 (2010)............................................................................10

*Frisby v. Schultz*,
    487 U.S. 474 (1988)............................................................................12

*Frudden v. Pilling*,
    742 F.3d 1199 (9th Cir. 2014) ..............................................................8

*Gonzalez v. Ocwen Loan Servicing*,
    2018 WL 4217065 (M.D. Fla. Sept. 5, 2018)......................................17

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*,
    452 U.S. 640 (1981)............................................................................14

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*In re Rules and Regulations Implementing the TCPA,*
  18 FCC Rcd. 14014 (2003) ........................................................................................2

*In re Rules and Regulations Implementing the TCPA,*
  30 FCC Rcd. 7961 (2015) ..................................................................3, 6, 16, 17

*In re Rules and Regulations Implementing the TCPA,*
  31 FCC Rcd. 9054 (2016) ....................................................................................3, 6

*Lucia* v. *SEC,*
  138 S. Ct. 2044 (2018) ............................................................................................9

*Maddox v. CBE Grp., Inc.,*
  2018 WL 2327037 (N.D. Ga. May 22, 2018) ........................................................17

*Mais v. Gulf Coast Collection Bureau, Inc.,*
  768 F.3d 1110 (11th Cir. 2014) ............................................................................16

*Marks v. Crunch San Diego, LLC,*
  904 F.3d 1041 (9th Cir. 2018) ..............................................................................17

*Martin v. City of Struthers,*
  319 U.S. 141 (1943) ..............................................................................................14

*Pinkus v. Sirius XM Radio Inc.,*
  319 F. Supp. 3d 927 (N.D. Ill. 2018) ....................................................................17

*Police Department of Chicago* v. *Mosley,*
  408 U.S. 92 (1972)..........................................................................................4, 5, 8, 9

*Reed* v. *Town of Gilbert,*
  135 S. Ct. 2218 (2015) ..........................................................................................4, 6

*Rosenberger* v. *Rector,*
  515 U.S. 819 (1995) ................................................................................................5

*Rowan v. U.S. Post Office Dep't,*
  397 U.S. 728 (1970) ..............................................................................................14

*Susan B. Anthony List v. Driehaus,*
  134 S. Ct. 2334 (2014) ............................................................................................1

*The Florida Star* v. *BJF,*
  491 U.S. 524 (1989) ................................................................................................7

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ..............................................................................................12

*Williams-Yulee* v. *Florida Bar,*
  135 S. Ct. 1656 (2015) ........................................................................................6, 7

*Wollschlaeger v. Governor,*
  848 F.3d 1293 (11th Cir. 2017) ..............................................................................4

# TABLE OF AUTHORITIES
## (continued)

Page(s)

**STATUTES**

47 U.S.C. § 227 ............................................................................................ *passim*

**OTHER AUTHORITIES**

H.R. Rep. No. 102-317 (1991) ........................................................................ 12

S. Rep. No. 102-178 (1991) ............................................................................ 12

Apple,
*How To Use Do Not Disturb While Driving*, (Sep. 17, 2018) ................................. 13

Apteligent Data,
*iOS Distribution and iOS Market Share*, (Oct. 10, 2018) ...................................... 12

FCC, Public Notice,
*Consumer & Governmental Affairs Bureau Seeks Comment on Interpretation
of the in Light of the D.C. Circuit's* ACA International *Decision*,
83 Fed. Reg. 26284 (2018) ............................................................................ 16

Nancy Messieh,
*How To Send Automatic Replies to Text Messages on Android*,
(May 10, 2017) ............................................................................................ 13

Ed Pesce & Niels Lesniewski,
*Democrats Have Few Tactical Options To Fight Supreme Court Pick*,
Roll Call (July 10, 2018) ............................................................................... 15

SBA List,
*About Susan B. Anthony List* ........................................................................... 1

Deirdre Shesgreen,
*Schumer Vows To Fight Trump SCOTUS Nominee "with Everything I Have,"*
USA Today (July 9, 2018) ............................................................................. 15

Verizon,
*Turn On Auto Reply—Verizon Messages—Android Smartphone* ........................... 13

Defendant Susan B. Anthony List, Inc., moves to dismiss Plaintiff's complaint.   As an overbroad, content-based restriction on speech, the Telephone Consumer Protection Act's limitations on calls made using an automatic telephone dialing system (or ATDS) cannot stand, at least as applied to the targeted, time-sensitive, minimally intrusive political speech at issue in this case.   Alternatively, this Court should stay proceedings until the Federal Communications Commission finishes its already-initiated review of the proper interpretation of the statute.

## I.   BACKGROUND

SBA List is a non-profit organization whose mission is to "end abortion by electing national leaders and advocating for laws that save lives, with a special calling to promote pro-life women leaders."  SBA List, *About Susan B. Anthony List*, https://www.sba-list.org/about-susan-b-anthony-list (last visited Sept. 8, 2018); *see also, e.g.*, *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334 (2014).  With the announcement of Justice Kennedy's retirement and President Trump's nomination of then-Judge Kavanaugh to replace him on July 9, 2018, SBA List spotted a unique, time-sensitive opportunity: it believed that, if confirmed, Justice Kavanaugh would allow voters and their elected representatives, not judges, to decide important questions about abortion policy.  Accordingly, it wanted to reach out quickly to like-minded individuals to urge them to contact Senator Bill Nelson—a Florida Democrat locked in a tight re-election battle with former Florida Governor Rick Scott—and urge then-Judge Kavanaugh's confirmation.

SBA List sought to do so through the quickest and least intrusive means available:   text messages.  It first acquired a list of those likely to support its pro-life message from i360, a data-analytics company.  SBA List had good reason to believe that these individuals would appreciate hearing about pro-life policies; i360 compiled its data from a variety of sources, including voter records, to ensure more precise and effective messaging.  Added to this list were some individuals who were *already* SBA List members who had previously provided their contact information.

Armed with this contact information, SBA List hired a vendor, Direct Technology Solutions, which in turn hired another vendor, MudShare, to send the messages.  Direct Technology Solutions worked with SBA List to craft the message that SBA List wished to distribute.  That message—sent July 13, 2018—stated:

> Trump made his Supreme Court pick!  Will Nelson stand with Florida or extreme abortion groups?  Watch Now:  https://youtu.be/jJxPCfMZOCc.  Reply STOP to opt out.

Complaint ¶ 19.  The linked video reiterated SBA List's message:  "The Court and innocent lives are on the line.  President Trump has nominated another fair, independent Justice.  Will Senator Nelson stand with us?  Or [with extreme abortion groups]?"

Plaintiff Shehan Wijesinha, a serial litigant, received SBA List's text message and clicked the link to watch its video.  Complaint ¶¶ 19–21.  Rather than just ignore the text or opt out of any future texts, he brought this putative class action.  He alleges that SBA List violated the TCPA's $500-per-call restriction on the use of so-called "automatic telephone dialing systems" (or "ATDSs"), defined as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1); *see id.* § 227(b)(1)(A)(iii), (b)(3); *see also In re Rules and Regulations Implementing the TCPA*, Report and Order, 18 FCC Rcd. 14014, 14115 (2003) (interpreting "call" to include sending text messages). Because SBA List's message was delivered to roughly 203,500 people, Wijesinha and his lawyers— also repeat TCPA players—now seek up to $300,000,000 in damages from a charitable organization whose net assets in fiscal year 2016 totaled less than $2 million.    Complaint ¶ 48(d); https://bit.ly/2AqqgNr.

## II.    HOLDING SBA LIST LIABLE HERE WOULD VIOLATE THE FIRST AMENDMENT

Fortunately, the Constitution stands in the way of Plaintiff's attempt to destroy SBA List for the grievous harm of sending a single, time-sensitive political text message to a list of those it reasonably

believed would want to hear from it about pro-life causes.  As it stands, the TCPA contains a host of content-based exemptions, exemptions that violate the fundamental principle that neither Congress nor the Federal Communications Commission may prefer one message over another absent compelling justification.  Moreover, insofar as it is applied to cover a one-off text message sent to those likely to desire receiving that message, the TCPA is an overbroad prophylactic restriction on speech.

### A.     The TCPA's Content-Based Provisions Cannot Survive Strict Scrutiny

The TCPA's original ATDS provision exempted only emergency calls—for every other kind of message, it was "unlawful" to "make any call … using any [ATDS] … to any telephone number assigned to a … cellular telephone service" without "the prior express consent of the called party."  47 U.S.C. § 227(b)(1)(A)(iii) (1992).  Since then, however, the ATDS provision has acquired a number of content-based exemptions.  Congress recently exempted calls "made solely to collect a debt owed to or guaranteed by the United States."   47 U.S.C.  § 227(b)(1)(A)(iii).   In addition, the Federal Communications Commission has exempted other kinds of messages on account of their content: "package delivery notifications," *see Cargo Airline Ass'n Petition*, 29 FCC Rcd. 5056, 5056 (2014) (2014 TCPA Order); certain calls regarding "financial and healthcare issues," such as "calls regarding money transfers" and "exam reminders," *In re Rules and Regulations Implementing the TCPA*, 30 FCC Rcd. 7961, 8023, 8026, 8030 (2015) (2015 TCPA Order); calls by schools that are "closely related to the school's mission, such as notification of an upcoming teacher conference or general school activity," *In re Rules and Regulations Implementing the TCPA*, 31 FCC Rcd. 9054, 9061 (2016) (2016 TCPA Order); and calls by "utility companies" on "matters closely related to the utility service, such as a service outage," 2016 TCPA Order, at 9061.  In light of these exemptions for some types of speech but not others, the ATDS provision violates the First Amendment and must fall.

### 1.    These exemptions render the TCPA content-based

A law is content-based if it "draws distinctions based on the message a speaker conveys." *Reed*
v. *Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015); *see also, e.g.*, *Wollschlaeger v. Governor*, 848 F.3d
1293 (11th Cir. 2017) (en banc). Some content-based distinctions are "obvious," "defining regulated
speech by particular subject matter." *Reed*, 135 S. Ct. at 2227.  "Others are more subtle, defining
regulated speech by its function or purpose." *Id.*

The Supreme Court has held that laws that include content-based exemptions are content-based
restrictions of speech. For example, in *Police Department of Chicago* v. *Mosley*, 408 U.S. 92 (1972),
and *Carey* v. *Brown*, 447 U.S. 455 (1980), the government prohibited school picketing (*Mosley*) and
residential picketing (*Carey*), each time with an exemption for picketing on labor issues. In each case,
the Supreme Court ruled that the picketing ordinances were content-based because they included a
content-based exception. In *Mosley*, the Court explained that the school-picketing ordinance
"discriminat[ed] among pickets … based on the content of their expression": labor pickets were
allowed, but all other pickets were forbidden. 408 U.S. at 102. And in *Carey*, the Court explained that
the residential-picketing ordinance "accord[ed] preferential treatment to the expression of views on one
particular subject; information about labor disputes [could] be freely disseminated, but discussion of all
other issues [was] restricted." 447 U.S. at 461; *see also Arkansas Writers' Project, Inc.* v. *Ragland*, 481
U.S. 221, 229 (1987) (a state sales that exempted religious, trade, professional, and sports magazines
but not other types of magazines was "particularly repugnant to First Amendment principles" because
"a magazine's tax status depend[ed] entirely on its *content*.").

These decisions are "firmly grounded in basic First Amendment principles." *City of Ladue* v.
*Gilleo*, 512 U.S. 43, 51 (1994). "[A]n exemption from an otherwise permissible regulation of speech
may represent a governmental 'attempt to give one side of a debatable public question an advantage in
expressing its views to the people.'" *Id.* (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765,

4

785–86 (1978)). In addition, "through the combined operation of a general speech restriction and its exemptions, the government might seek to select the 'permissible subjects for public debate.'" *Id.* (quoting *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 538 (1980)). Finally, "[e]xemptions from an otherwise legitimate regulation of a medium of speech … may diminish the credibility of the government's rationale for restricting speech in the first place." *Id.* at 52. If the government truly took the rationale for a speech restriction seriously, it would apply that restriction across the board, rather than selectively exempt certain content from the ban.

Section 227(b)(1)(A)(iii) is content-based. The statute on its face includes a content-based exemption by prohibiting the use of ATDS equipment to call cell phones, "unless such call is made solely to collect a debt owed to or guaranteed by the United States." The exemption "draws distinctions based on the message a speaker conveys": A caller may use an ATDS to collect a government debt, but not to urge church attendance, solicit a charitable contribution, or, as here, urge someone to contact her Senator about a nomination. The exemption also "defin[es] regulated speech by its function or purpose": calls made for the purpose of collecting a government debt enjoy the exemption, but calls made for other purposes do not. Just as the laws in *Carey* and *Mosley* singled out labor picketing for special favor, this law singles out calls about government debts for special favor.

Indeed, the debt-collection exemption amounts to viewpoint discrimination—a "blatant" and "egregious form of content discrimination." *Rosenberger* v. *Rector*, 515 U.S. 819, 829 (1995). The federal government and its allies may use an ATDS to call debtors to urge them to pay their debts to the government. Yet, at the same time, private debt counselors may not use an ATDS to call debtors to advise them to negotiate a debt settlement, to challenge the debt in court, or to declare bankruptcy.

The Commission's administratively conferred exemptions make matters even worse. The Commission has exempted "package delivery notifications" "based on their popularity." 2014 TCPA

Order, 29 FCC Rcd at 5056. It has exempted certain calls regarding "financial and healthcare issues"—for example, "calls regarding money transfers" and "appointment and exam confirmations and reminders"—on the ground that these messages are "pro-consumer." 2015 TCPA Order, 30 FCC Rcd. at 8023, 8025, 8030. And it has ruled that schools and utilities may make automated calls to notify parents and customers about upcoming school conferences and service interruptions. 2016 TCPA Order, 31 FCC Rcd at 9061.

The resulting regime is pervasively content-based. Banks may use an ATDS to tell customers about money transfers, but Bernie Sanders may not use an ATDS to tell his supporters about plans to break up the big banks. A doctor may remind patients to attend a checkup, but a pastor may not remind parishioners to attend church. A school may notify parents of an upcoming teacher conference, but a charity may not notify them of an upcoming fundraiser. And a utility may warn customers that they will lose electricity because of a storm, but a satellite dish company may not warn them that they will lose satellite reception because of the same storm. This discrimination is all the more suspect because it reflects a government agency's judgments about which messages are "popular" or "pro-consumer."

### 2.     These exemptions cannot survive strict scrutiny

"A law that is content based … is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus towards the ideas contained' in the regulated speech." *Reed*, 135 S. Ct. at 2228 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)). To satisfy strict scrutiny, the government must "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* at 2231. Section 227(b)(1)(A)(iii) fails this test.

*First*, Section 227(b)(1)(A)(iii) fails strict scrutiny because its exemptions suggest that it does not truly serve a compelling interest. A compelling interest is "a state interest of the highest order." *Williams-Yulee* v. *Florida Bar*, 135 S. Ct. 1656, 1666 (2015). But "a law cannot be regarded as

protecting an interest of the highest order, and thus as justifying a restriction upon … speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *The Florida Star* v. *BJF*, 491 U.S. 524, 541–42 (1989) (Scalia, J., concurring in the judgment) (citation omitted); *see Williams-Yulee*, 135 S. Ct. at 1668 ("Underinclusiveness can … reveal that a law does not actually advance a compelling interest"). For example, in *Carey*, the Supreme Court relied on the labor-picketing exemption to conclude that a residential-picketing ordinance did not serve a compelling interest. The Court acknowledged that, as an abstract matter, "preserving the sanctity of the home … is surely an important value." 447 U.S. at 471. Even so, the labor-picketing exemption "suggest[ed] that [the state] itself has determined that residential privacy is not a transcendent objective." *Id.* at 465. The "underinclusiveness of the statute's restriction" "undermine[d] [the state's] claim" to be protecting a compelling interest. *Id.* at 465–66.

So also here. If the Federal Government truly believed that protecting people from autodialed calls is an "interest of the highest order," it would have prohibited *all* autodialed calls. It has not done so. Quite the contrary, it has authorized debt collectors, package deliverers, banks, hospitals, schools, and utilities to make autodialed calls to deliver government-approved messages. In granting these exemptions, the Federal Government itself has determined that protecting people from autodialed calls is *not* a transcendent objective. Rather, the Federal Government has concluded that other interests, such as collecting debts and facilitating package deliveries, are even more important. Having made that judgment, the Federal Government cannot now turn around and claim that § 227(b)(1)(A)(iii) serves an interest of the highest order after all.

*Second*, Section 227(b)(1)(A)(iii) fails strict scrutiny because its content-based exceptions fail strict scrutiny. When a speech restriction includes a content-based exemption, the government must do more than show that the restriction as a whole satisfies strict scrutiny; "[the] content-based exemption

also must survive strict scrutiny." *Frudden v. Pilling*, 742 F.3d 1199, 1207 (9th Cir. 2014). For example, in *Mosley*, the Supreme Court struck down a school-picketing ordinance with an exemption for labor picketing. The interest in "preventing school disruption" could justify an across-the-board ban on picketing, but could not justify a ban with an exemption for labor picketing, because "nonlabor picketing … is obviously no more disruptive than … labor picketing." 408 U.S. at 100. Similarly, in *Carey*, the Court struck down a residential-picketing ordinance with an exemption for labor picketing. The interest in protecting "residential privacy" could justify an across-the-board ban on residential picketing, but could not justify a ban with an exemption for labor picketing, because "nonlabor picketing [and] labor picketing [are] equally likely to intrude on the tranquility of the home." 447 U.S. at 462. Again, in *Arkansas Writers Project*, the Court struck down a sales tax with an exemption for religious, professional, trade, and sports magazines. The "general interest in raising revenue" justified a sales tax, but it "d[id] not explain [the] selective imposition of the sales tax on some magazines and not others, based solely on their content." 481 U.S. at 231.

Under these principles, Section 227(b)(1)(A)(iii) cannot survive. An exemption for calls to collect government debts does not serve any compelling interest, much less serve such an interest in a narrowly tailored way. To be sure, the exemption helps the government collect money from its debtors. The Supreme Court has ruled, however, that "avoid[ing] a drain on public resources" is not a compelling interest. *Arizona Free Enter. Club's Freedom Club PAC* v. *Bennett*, 564 U.S. 721, 747 (2011).

By the same token, the exemptions for calls regarding package deliveries, financial issues, healthcare issues, school issues, and utility service also fail strict scrutiny. The government has no compelling interest in giving special protection to the expression of views on favored subjects such as finance and healthcare. Quite the opposite, the First Amendment prohibits "preferential treatment to the expression of views on one particular subject." *Carey*, 447 U.S. at 461.

8

In the final analysis, the ATDS restriction in this case suffers from the same basic flaw as the residential-picketing ordinance in *Carey*. In each case, the government has ostensibly sought to promote "residential privacy" and "the tranquility of the home." *Id*. at 462. In each case, the government has refused to pursue these interests through "uniform and nondiscriminatory regulation." *Id*. at 470. The government has instead adopted restrictions that "discriminat[e] … based on the subject matter of [the] expression." *Id.* at 471. This discrimination has no connection with the privacy interest that ostensibly justified the statute in the first place. In *Carey*, "nothing in the content-based labor-nonlabor distinction ha[d] any bearing whatsoever on privacy." *Id*. at 465. Similarly, here, nothing in the content-based debt versus non-debt distinction has any bearing whatsoever on privacy. Just as the statute in *Carey* violated the Constitution, so too the statute here violates the Constitution.

### 3.       The proper remedy is to invalidate Section 227(b)(1)(A)(iii)

The appropriate remedy for this obvious constitutional defect in Section 227(b)(1)(A)(iii) is to level up—to declare this provision of the statute invalid, so that all speakers, not just government-favored speakers such as debt collectors and banks, may use ATDS equipment to call cell phones. The appropriate remedy is *not* to level down—to strike down the content-based exemptions, so that no speaker may use ATDS equipment to call cell phones.

*First*, the Supreme Court has ruled that the appropriate remedy for a speech restriction with an impermissible content-based exemption is to set aside the restriction, not to set aside the exemption. In *Mosley* and *Carey*, the Supreme Court invalidated the entire picketing ordinance, not just the content-based exemption for labor picketing. 408 U.S. at 102; 447 U.S. at 471. In *Arkansas Writers Project*, the Supreme Court invalidated the application of the sales tax to magazines, not just the content-based tax exemptions for religious, trade, professional, and sports magazines. 481 U.S. at 234.

These decisions reflect the principle that courts must choose remedies that "create incentives to raise [constitutional] challenges." *Lucia* v. *SEC*, 138 S. Ct. 2044, 2055 n.5 (2018) (punctuation and

alterations omitted) (quoting *Ryder v. United States*, 515 U.S. 177, 183 (1995)). In a free-speech case, only leveling up—eliminating the restriction on speech—creates such an incentive. A speaker would have little incentive to challenge a discriminatory restriction on speech, if the only remedy it could obtain is the expansion of that restriction to cover more speech.

These decisions also reflect the reality that the invalidation of an exemption can itself raise new constitutional problems. When a court invalidates an exemption, it retroactively imposes liability on speakers who relied on that exemption while it was on the books. Such retroactive liability clashes with the principle that the government must give speakers "fair notice" *before* restricting their speech. *FCC* v. *Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Leveling up is thus the only remedy that solves the constitutional problems created by the defective statute without creating new problems to take their place.

These precedents require invalidation of the ATDS restriction, rather than invalidation of the exemptions for debt-collection calls, package-delivery notifications, and so on. That is the only course that preserves an incentive to raise challenges to content-discriminatory laws such as the TCPA. A litigant such as SBA List would have little reason to bring such a challenge, if all it could get is the application of the TCPA to even more callers.

*Second*, invalidating the restriction is particularly appropriate here because of the sheer number of exemptions at issue. Courts, unlike Congress, lack the "editorial freedom" to "blue-pencil" a statutory or regulatory scheme. *Free Enter. Fund* v. *PCAOB*, 561 U.S. 477, 510 (2010). The simple remedy of invalidating Section 227(b)(1)(A)(iii) is consistent with this limit on judicial authority. The more complex remedy of invalidating a series of exemptions scattered across the United States Code and Code of Federal Regulations is not.

10

*Finally*, invalidating the restriction is appropriate here because constitutional defects are inherent in the restriction itself—not simply in the exemptions. The restriction does not advance a compelling interest; as discussed above, the Federal Government's readiness to grant exemptions from the restriction itself suggests that the Federal Government does not consider the goals advanced by the restriction to be of paramount importance. Further, the restriction is not narrowly tailored to any compelling interest because it targets far more than the exact source of the evil sought to be remedied. *See supra* 9. Only the invalidation of the restriction would cure these problems; the invalidation of the exemptions would not.

For these reasons, this Court should hold that the TCPA's restriction on using ATDS equipment to call cell phones violates the First Amendment.  As a result, SBA List cannot be held liable under that provision for the texts it sent urging then-Judge Kavanaugh's confirmation, and Wijesinha's Complaint must therefore be dismissed.

**B.    The TCPA's ATDS Provision Is Unconstitutionally Overbroad If Applied To Cover Equipment That Merely Stores and Dials Numbers**

Recall that the TCPA's ATDS provision makes it unlawful (absent "prior express consent") to "call" wireless subscribers "using an [ATDS]," defined as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1), (b)(1)(A)(iii).  By its terms, this provision covers only equipment with the capacity to generate and dial random or sequential numbers, not simply to dial from a list.  *See, e.g.*, *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 121 (3d Cir. 2018) (describing the "key … question" as "whether [the equipment] functioned as an autodialer by randomly or sequentially generating telephone numbers").  But because such equipment has not been in use for years, plaintiffs like Wijesinha must insist that the ATDS provision also covers devices that merely store and dial numbers from a list. *See* Complaint ¶ 44 (the ATDS provision covers *any* call or text delivered "without

11

human intervention," including calls or texts to numbers contained on a targeted list).  So construed, the ATDS provision unconstitutionally restricts too much speech.

Even content-neutral speech restrictions must "serve a significant government interest, be narrowly tailored to serve that interest, and leave open ample alternative channels of communication." *Ward v. Rock Against Racism*, 491 U.S. 781, 804 (1989).  To be narrowly tailored, a content-neutral restriction on speech must "target[] and eliminate[] no more than the exact source of the 'evil' it seeks to remedy."  *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).  The ATDS provision, construed as plaintiffs like Wijesinha demand, violates these requirements.  Under this interpretation, the TCPA covers far more than the "exact source of the evil" Congress attempted to eliminate in 1991—randomly or sequentially generated calls that tied up hospital lines, overwhelmed 911 operators, and crashed early wireless networks.  *See* S. Rep. No. 102-178, at 2 (1991); H.R. Rep. No. 102-317, at 10 (1991).  Instead, it also covers equipment that almost certainly *does not* create those harms—such as equipment that merely dials from a preprogrammed list of numbers.  Such prophylaxis is not allowed under the First Amendment.

Indeed, Wijesinha's interpretation of the ATDS provision is so broad that it covers hundreds of millions of ordinary smartphones.  Take for instance the iPhone, used by millions of Americans every day to make hundreds of millions of calls and send billions of texts.  *See, e.g.*, *Subscriber Share Held by Smartphone Operating Systems in the United States from 2012 to 2018*, https://goo.gl/zLAqWv (2018) (noting that 44% of Americans with smartphones have iPhones).  Every iPhone capable of running iOS version 11 or later—that is, 57.9% of existing iPhones, *see* Apteligent Data, *iOS Distribution and iOS Market Share*, https://bit.ly/2I1y6BL (Oct. 10, 2018)—comes with a pre-programmed feature called "Do Not Disturb."  That program allows users to respond automatically to incoming texts.  For example, with a few taps, it can be set to activate when driving: "If someone sends

you a message, they receive an automatic reply letting them know that you're driving."  Apple, *How To Use Do Not Disturb While Driving*, https://apple.co/2w8nurH (Sep. 17, 2018).  It can also be set to respond automatically in a more targeted fashion.  For example, you can set it to respond to certain groups of people—say, to recent callers, people on your Favorites list, or anyone in your Contacts— while you're at a movie or trying to get some work done.  *See id.*  The millions of smartphone users who prefer Android phones have similar options.  *See, e.g.*, Nancy Messieh, *How To Send Automatic Replies to Text Messages on Android*, https://bit.ly/2IRgGWA (May 10, 2017) (discussing third-party apps such as SMS Auto Reply Text Message and If This Then That); Verizon, *Turn On Auto Reply— Verizon Messages—Android Smartphone*, https://vz.to/2A5tqpH (discussing how to activate Verizon's auto-reply functionality for its messaging app).

Congress would never have chosen to prohibit "every uninvited communication from a smartphone," making "nearly every American … a TCPA-violator-in-waiting, if not a violator-in-fact." *ACA Int'l v. FCC*, 885 F.3d 687, 698 (D.C. Cir. 2018).  But even if it tried to do so (as Wijesinha insists), the First Amendment—which prohibits grossly overbroad speech restrictions—would stand in its way.

### C.   At the Least, the TCPA's ATDS Provision Cannot Be Applied to Targeted, One-Off, Costless, Time-Sensitive Political Text Messages

Finally, even setting aside the ATDS provision's rampant content- and viewpoint-based discrimination, and even setting aside the wild overbreadth inherent in Wijesinha's position, SBA List still could not be held liable in this particular case.  *First*, the Government lacks a legitimate interest in saving people from the trifling harm—if any—of receiving a single, costless, targeted text message before opting out of future text messages.  As explained, the TCPA's ATDS provision was enacted to thwart a particularly aggravating kind of speech:  a phone call delivered at random—and often at dinner time—to hawk "free" cruises and other questionable products.  *See supra* 12.  The annoyance at stake there differs in kind from what the recipient of a text message—even an *unwanted* text message—faces:

ignoring or deleting the text, or replying "STOP" to prevent subsequent texts. This at-most-minor inconvenience is less than the inconvenience involved in receiving unwanted handbills or letters delivered in person. And yet the Supreme Court has held that the government may not "substitute[] the judgment of the community for the judgment of the individual householder" by prophylactically prohibiting the distribution of such materials. *Martin v. City of Struthers*, 319 U.S. 141, 144 (1943). Instead, "[f]reedom to distribute information to every citizen wherever he desires to receive it is so clearly vital to the preservation of a free society" that "each householder" must be given "the full right to decide whether he will receive strangers as visitors." *Id.* at 146–47; *see also Rowan v. U.S. Post Office Dep't*, 397 U.S. 728, 735–38 (1970) (upholding a statute allowing homeowners to block mail, but only because the "mailer's right to communicate [wa]s circumscribed only by an affirmative act of the addressee giving notice that he wishe[d] no further mailings from that mailer"). If the government's interest in stopping strangers from knocking on doors to deliver advertisements isn't strong enough to justify a blunderbuss ban, it lacks an interest in sparing people from the horrors of hitting the trash icon or saying "STOP" to a free but undesired political text message sent by someone who reasonably thought they would be interested in a time-sensitive message.

*Second*, the TCPA's ATDS restriction—at least as applied to targeted, time-sensitive, cost-free political messages—does not leave open ample alternative channels of communication. To be sure, the First Amendment does not force governments to allow speakers to "communicate [their] views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). But it does require governments to leave speakers with "adequate means" to do so. *Id.* at 655. Prohibiting SBA List's text messages does not. Then-Judge Kavanaugh was nominated on July 9, 2018, and Senator Grassley, the Chair of the Senate Judiciary Committee, promised soon thereafter that then-Judge Kavanaugh would be confirmed before the start

of the Supreme Court's October Term 2018. *See, e.g.*, Ed Pesce & Niels Lesniewski, *Democrats Have Few Tactical Options To Fight Supreme Court Pick*, https://bit.ly/2Phj0f3, Roll Call (July 10, 2018). Senators immediately began announcing their positions on then-Judge Kavanaugh's nomination as well. *See, e.g.*, Deirdre Shesgreen, *Schumer Vows To Fight Trump SCOTUS Nominee "with Everything I Have*," https://bit.ly/2NnZDfk, USA Today (July 9, 2018). Voters thus had to act quickly in order to have their voices heard by their elected representatives. In that scenario, text messages—a uniquely quick, cheap, effective, and unobtrusive approach—represented the only plausible means for doing so. SBA List could not slog through the expense and delay of what is appropriately called "snail mail." Nor could it timely call each of these 203,500 people to secure their prior express consent, at least not without using equipment that Plaintiff would contend qualified as an ATDS in its own right. Finally, SBA List obviously could not exercise its unquestioned right to knock on peoples' doors; even if it could determine where they lived—and even if SBA List *wanted* to use this much more intrusive method—it could not have reached all 203,500 of them with the requisite urgency. For SBA List, it was texts or nothing. Even if it had meant to do so, Congress cannot constitutionally put SBA List to that choice.

## III.   ALTERNATIVELY, THIS COURT SHOULD STAY PROCEEDINGS UNTIL THE FCC HAS INTERPRETED THE ATDS PROVISION

The unconstitutionality of the TCPA's ATDS provision is clear. But if the Court wishes to avoid deciding that question right now, there is a very good reason to do so: the FCC will soon issue *its* interpretation of the statute, one that will likely moot the constitutional questions raised here.

Under the primary jurisdiction doctrine, a district court may "stay[] further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling" on "some issue within the special competence of an administrative agency." *Boyes v. Shell Oil Prods. Co.*, 199 F.3d 1260, 1265 (11th Cir. 2000) (quoting *Reiter v. Cooper*, 507 U.S. 258, 268 (1993)). And under its own inherent authority, a district court may stay proceedings to manage its docket in an orderly, efficient manner. *See*

*Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1172 n.7 (11th Cir. 2004). Both sources of power justify a stay here.

Consider first the primary jurisdiction doctrine. Congress has given the FCC authority to "prescribe regulations to implement the requirements" of the TCPA's prohibitions. 47 U.S.C. § 227(b)(2). That authority includes the authority to interpret the ATDS provision. *See, e.g.*, *ACA Int'l*, 885 F.3d at 693. And once the FCC has spoken, its conclusions are final, at least for purposes of private litigation. Under the Administrative Orders Review Act (sometimes known as the Hobbs Act), the FCC's interpretations may only be challenged by direct review of an agency order in a court of appeals; they may not be set aside by a district court in private litigation, no matter how unlawful. *See, e.g.*, *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1119–21 (11th Cir. 2014).

The FCC is about to deliver its definitive position on a host of issues at the heart of this case. In its 2015 Declaratory Ruling, the FCC reiterated its prior statements adopting conflicting interpretations of the ATDS requirement—at times the FCC suggested that ATDSs must be able to generate and dial randomly or sequentially generated numbers, but at others it suggested the ability to dial from a list sufficed. *See ACA Int'l*, 885 F.3d at 701–02. The D.C. Circuit set aside that arbitrary approach, *see id.* at 702–03, but the FCC has sought and received comment on its efforts to revisit the issue (as well as a host of other issues, such as whether *ACA International* invalidated all of the FCC's prior statements about ATDS functionality or instead just the 2015 Declaratory Ruling's statements on that front), *see* FCC, Public Notice, *Consumer & Governmental Affairs Bureau Seeks Comment on Interpretation of the [TCPA] in Light of the D.C. Circuit's* ACA International *Decision*, 83 Fed. Reg. 26284 (2018). The FCC's upcoming decision will likely end this case—after all, then-Commissioner, now-Chairman Pai *dissented* from the 2015 Declaratory Ruling in part because of his view that "[e]quipment that cannot store, produce, or dial a random or sequential telephone number does not qualify as an [ATDS]," 30

FCC Rcd. 7961, 8077 (Pai, Comm'r, dissenting), and nobody uses random or sequential number generators any more. But either way, the FCC—the agency tasked by Congress with authoritatively interpreting the TCPA—should have the first chance to assess these case-dispositive issues before this Court unnecessarily assesses the TCPA's constitutionality.

For similar reasons, a stay would also be appropriate under this Court's inherent authority. The proper interpretation of the TCPA's ATDS provision has already created a circuit split. *Compare Dominguez*, 894 F.3d at 121 (the provision requires random or sequential number generation), *with Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1053 (9th Cir. 2018) (the provision covers equipment that merely "store[s] numbers to be called" and then calls those numbers automatically). It has also led to chaos in the district courts. *Compare, e.g.*, *Pinkus v. Sirius XM Radio Inc.*, 319 F. Supp. 3d 927 (N.D. Ill. 2018) (*ACA International* swept away the FCC's prior statements and the statute does not cover dialing from a list), *with, e.g.*, *Ammons v. Ally Fin., Inc.*, 326 F. Supp. 3d 578, 2018 WL 3134619, at *6 (M.D. Tenn. 2018) (*ACA International* did not affect prior orders suggesting the ability to dial automatically from a list sufficed). Indeed, district courts within the Eleventh Circuit find themselves on opposite sides of these issues. *Compare, e.g.*, *Maddox v. CBE Grp., Inc.*, 2018 WL 2327037, at *4 (N.D. Ga. May 22, 2018) (prior rulings survived), *with Gonzalez v. Ocwen Loan Servicing*, 2018 WL 4217065, at *5 (M.D. Fla. Sept. 5, 2018) (prior rulings died). There is no reason for this Court to waste its time, or for the parties to waste their money, litigating issues that will shortly be addressed in binding fashion by the FCC.

## IV.    CONCLUSION

Whatever its validity as originally enacted and applied in the early 1990s, the TCPA has been transformed into a statute that subjects disfavored content to massive class-action liability and that prohibits costless, time-sensitive political text messages for no good reason.  Because the TCPA's ATDS provision is doubly unconstitutional, at least as applied in this case, Wijesinha's Complaint must be dismissed.  Alternatively, this Court could avoid unnecessarily invalidating a federal statute by staying this case until after the FCC's upcoming decision, which will likely moot the issue anyway.

## CERTIFICATE OF GOOD FAITH CONFERENCE

I HEREBY CERTIFY that on October 23, 2018, counsel for SBA List conferred with counsel

for Plaintiff in a good-faith effort to resolve the issues raised in SBA List's motion to stay proceedings.

Counsel for Plaintiff opposes this motion.


Date: October 26, 2018

Respectfully submitted,

*/s/ Paul C. Huck Jr.*
Paul C. Huck Jr.
Florida Bar No. 968358
Email: paulhuck@jonesday.com
Christopher R.J. Pace
Florida Bar No. 721166
Email: crjpace@jonesday.com
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, FL 33131
Telephone:  (305) 714-9700

Thomas Demitrack (*Pro Hac Vice* Motion Pending)
Email: tdemitrack@jonesday.com
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114
Telephone: (216) 586-3939

Shay Dvoretzky (*Pro Hac Vice* Motion Pending)
Email: sdvoretzky@jonesday.com
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3939

***Counsel for Defendant Susan B. Anthony List, Inc.***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 26, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

*/s/ Paul C. Huck Jr.*
Paul C. Huck Jr.
